IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| KNIGHT SPECIALTY INSURANCE COMPANY<br>4751 Wilshire Blvd., Suite 111<br>Los Angeles, CA 90010 | * | |
| | * | |
| | * | |
| Plaintiff, | * | CIVIL ACTION NO. |
| v. | * | |
| EVERMORE CANNABIS COMPANY, LLC<br>500 Redland Court, Suite 209<br>Baltimore, MD 21117 | * | |
| | * | |
| <u>Serve on</u>:<br>      Craig R. Schulman, Resident Agent<br>      1 East Pratt St., Suite 904<br>      Baltimore, MD 21209 | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>COMPLAINT FOR DECLARATORY JUDGMENT</u>

Plaintiff, Knight Specialty Insurance Company, pursuant to 28 U.S.C. §§ 2201 and Federal Rule of Civil Procedure 57, files this Complaint for Declaratory Judgment against Defendant, Evermore Cannabis Company, LLC, and seeks a declaration of Knight Specialty Insurance Company's and Defendant's rights and obligations under the Commercial Policy, Policy No. KSQSPR001389-01 (the "Policy") issued to Temescal Wellness of MD, LLC *dba* Evermore Cannabis Company & The Living Room [1]. A copy of the Policy is attached hereto and incorporated herein by reference as **Exhibit 1.**

---

[1] According to Maryland State Departments of Assessments and Taxation, Temescal Wellness of Maryland, LLC has since changed its name to "Evermore Cannabis Company, LLC".

1

Specifically, Knight Specialty Insurance Company seeks a declaration that the Policy does not provide coverage for damages arising from the fire loss that impacted the 2200 Girard Avenue, Baltimore, MD 21211 location (the "Property") on April 7, 2024 (the "Date of Loss") (generally, the "Loss") due to material misrepresentations and/or omissions in the insurance application documents that clearly render the Policy void *ab initio* and failure to adhere to material protective safeguards. In support thereof, Plaintiff states the following:

**PARTIES**

1. Knight Specialty Insurance Company ("KSIC") is a corporation incorporated and existing under the laws of the State of Delaware, with its principal place of business in the State of California. KSIC is duly licensed and authorized to engage in the insurance business in the State of Maryland.

2. Evermore Cannabis Company, LLC ("Evermore") is a limited liability company incorporated under the laws of the State of Maryland, with its principal place of business in the State of Maryland. Evermore operates a commercial cannabis cultivation, manufacturing, distribution, and retail business, which is done, in part, at the Property. At all relevant times hereto, KSIC provided insurance coverage to Evermore pursuant to the Policy.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendant.

4. This Court has authority to grant KSIC declaratory relief pursuant to 28 U.S.C. §§ 2201 and Federal Rule of Civil Procedure 57 as this action involves an actual controversy that occurred and arose within this Court's jurisdiction.

2

5.      Venue is proper in this Court pursuant to 8 U.S.C. § 1391 because the Defendant resides in this District and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## STATEMENT OF FACTS

### The Insurance Application

6.      On or about April 4-5, 2023, Steven B. Sherman, Account Executive, PSA Insurance & Financial Services ("PSA"), acting as Evermore's insurance broker, submitted Evermore's "Proposed Insurance Program" and "Cannabis Operator Insurance Application" (collectively, the "Application") to Quadscore Insurance Services ("Quadscore"), a carrier partner of KSIC that issues KSIC policies. *See* **Exhibit 2a**, Proposed Insurance Program, and **Exhibit 2b**, Cannabis Operator Insurance Application.

7.      The Application was signed by Morey N. Zuskin, Evermore's General Manager and Principal, on behalf of Evermore. *See* Exhibit 2b, p. 9.

8.      Directly above the signature line for the Application included language which clearly communicated that KSIC's offer of insurance was conditioned upon the accuracy of the information provided by Evermore or its agents. Specifically, the language provided:

> The information provided by you or your representatives in all applications, submissions, or otherwise during the underwriting process concerning the nature of the operation of your business is material to the process of underwriting, pricing, and the offer of any policy. If a policy is offered it is being offered *subject to the accuracy of the information we have received related to the nature of your business operations as well as any representations or warranties made by you or on your behalf.* This application will be made a part of any policy offered.

*Id.* at p. 9 (emphasis added).

9.      Mr. Zuskin signed on behalf of Evermore directly below this language. *Id.*

10.     Mr. Zuskin also signed a "Request to Bind" as a part of the Application that specifically provided:

> *Any misrepresentations or concealments in the request to quote, the application, including attachments, or the request to bind for insurance will render insurance coverage null and void at inception.* The applicant has reviewed all parts and attachments of the quote, the application including attachments, and the request to bind and *acknowledge that all information is true and correct and understand that this insurance is based on the truth and completeness of the information provided.*

*See* **Exhibit 3**, Request to Bind, p. 1 (emphasis added).

11.     Mr. Zuskin signed on behalf of Evermore directly below this language. *Id.*

12.     The Cannabis Operator Insurance Application specifically asked Evermore "Do the grow rooms have smoke detectors in them?"; "If yes, how are the smoke detectors remotely monitored and do they provide alerts when no one is in the building?"; and "If yes, does the applicant maintain the monitoring service records (which will show if the smoke detectors properly notified the applicant)?" *See* Exhibit 2b, p. 4. Answering all of the questions in the affirmative, Evermore and/or PSA checked the box for "Yes" as to the last question. *Id.*

13.     Evermore provided the same information regarding its smoke detectors on a "Warranty Compliance Certification" that was submitted with the Application. *See* **Exhibit 4**, Warranty Compliance Certification, p. 1. Specifically, the Warranty Requirement language provided:

P-1. Smoke Detector Protective Safeguard

Insured premises listed in the schedule above is equipped with smoke detectors that are located throughout the building, *including but not limited to at least one smoke detector that is <u>physically located</u> in each grow room.*

All smoke detectors must be hardwired, remotely monitored and provide immediate alerts when the building is unoccupied.

4

The insured must maintain monitor servicing records and provide evidence annually to this Company that a monitoring service contract is in place at all times.

The insured shall exercise due diligence in maintaining in complete working order all equipment and services pertaining to the operation of this system which are under the control of the insured and shall give immediate notice of any impairment in or suspension of the smoke detectors equipment or service, known to the insured, to this Company.

*Id.* (emphasis added).

14.    In response to the question on the Warranty Compliance Certification, "Do You Comply?", Mr. Zuskin initialed the P-1 Warranty Requirement "MNZ" to affirm Evermore's compliance with the requirement. *Id.*

15.    On the Cannabis Operator Insurance Application, Evermore stated that they utilize two types of high intensity discharge light bulbs. Exhibit 2b, p. 4.

16.    The Cannabis Operator Insurance Application also specifically asked Evermore, "Is a light bulb replacement log kept of how often the light bulbs are replaced?"; and "Are all cultivation light bulbs replaced before 80% of expected life?". *Id.* Answering all of the questions in the affirmative, Evermore and/or PSA checked the box for "Yes" for both questions. *Id.*

17.    Evermore provided the same information regarding the replacement of high intensity discharge light bulbs and the replacement log on a "Warranty Compliance Certification" that was submitted with the Application, *See* Exhibit 4, p. 2. Specifically, the Warranty Requirement language provided:

P-3. High Intensity Discharge Protective Safeguard

In consideration premium at which this policy is written, ***it is a condition of this policy that if the premises schedule above utilizes high intensity discharge light bulbs***, it is warranted that Evermore:

- ***Replaced within 80% of life expectancy and or limited liability period, whichever is less on actual utilization.***

- ***Must maintain a record of the purchase, installation, and replacement schedule of the light bulbs.***
- The insured also warrants the high intensity discharge light bulbs are used in the recommended and appropriate fixture.
- Acceptable high intensity discharge light bulbs must have a 1 year warranty with the manufacturer.

The insured shall exercise due diligence in maintaining in complete working order all equipment and services pertaining to the operation of this system which are under the control of the insured and shall give immediate notice of any impairment in or suspension of the high pressure sodium light bulb or service, known to the insured, to this Company.

*Id.* (emphasis added).

18.     In response to the question on the Warranty Compliance Certification, "Do You Comply?", Mr. Zuskin initialed the P-3 Warranty Requirement "MNZ" to affirm Evermore's compliance with the requirement. *Id.*   Mr. Zuskin thereafter initiated the remaining Warranty Requirements and signed the Warranty Compliance Certification. *Id.* at 1-4.

**The Fire Alarm System**

19.     Long before Evermore applied for insurance from KSIC, Evermore submitted Fire Alarm Plan #2019-2412 in which the only smoke detectors that were included in Fire Alarm Plan #2019-2412 with respect to the grow rooms were duct detectors. *See* **Exhibit 5**, Letter from Baltimore City Fire Department. Fire Alarm Plan #2019-2412 was reviewed and approved by Baltimore City and the permit regarding such was issued on September 7, 2021 (*over a year and a half before Evermore submitted its Application to KSIC*). *Id.*

20.     Unlike typical smoke detectors that are physically located within a room, the duct detectors for the grow rooms were not physically located within the room, but were instead attached to duct panels that were physically located in the hallway or mezzanine areas outside of the grow rooms. *See* **Exhibit 6**, Picture of Duct Detector; **Exhibit 7**, Fire Alarm Map.

21.     Despite knowing KSIC's requirement to have "at least one smoke detector that is *physically located* in each grow room", Evermore, following its submission of Fire Alarm Plan #2019-2412,  never submitted a new fire alarm plan to the Baltimore City Fire Department that included at least one smoke detector *physically located* in each grow room. Exhibit 4, p. 1 (emphasis added); **Exhibit 8**, Morey Zuskin EUO (Dated September 16, 2024), 61:1-7.

22.     In fact, when Mr. Zuskin was asked to explain why Evermore did not submit a new fire alarm plan that included smoke detectors physically located in each grow room, Mr. Zuskin testified that Evermore was not required to have smoke detectors physically located in each grow room, and further asserted that, in fact, Evermore was not even allowed to have smoke detectors physically located in each grow room. Exhibit 8, 58:5-19; 62:6-7; 65:3-66:10.

23.     Indeed, Mr. Zuskin took the position that Evermore's purported compliance with any applicable fire codes and regulations negates any contractual requirements within the Policy. Mr. Zuskin testified that Evermore has to "go by…what is required by us from the state – and the city and the county" and that those requirements "trump anything else." *Id.* at 58:12-19. Mr. Zuskin further testified that "[T]he code is what we go by, not by what Knight has in their policy. We have to listen to the authority having jurisdiction, not Knight's policy." *Id.* at 65:3-6.

24.     However, when Mr. Zuskin was asked to produce some evidence of his claim that the Baltimore City Fire Department had forbidden Evermore from physically locating its smoke detectors in the grow rooms at the Property, the only evidence Mr. Zuskin identified was the Letter from the Baltimore City Fire Department attached hereto as Exhibit 5.

25.     While that Letter confirms that, pursuant to the 2018 Internation Fire Code, a smoke detection system is "not required" for non-residential spaces like the grow rooms, nowhere in the

Letter does it indicate that smoke detection systems are "not allowed" to be physically located in the grow rooms, as Mr. Zuskin purports in his testimony. *See* Exhibit 5; Exhibit 8, 61:17-62:7.

26.     Therefore, it is evident that Evermore installed the duct detectors in the hallway and mezzanine areas outside the grow rooms at the Property to satisfy the fire code over a year and a half before it applied to KSIC for the Policy and that Evermore simply assumed that its purported compliance with the fire code would also satisfy the P-1. Smoke Detector Protective Safeguard -- which was contractually required of Evermore as a condition precedent to coverage.

27.     If Evermore intended to treat its already existing duct detectors as suitable substitutes for the in-grow-room-smoke-detectors mandated by the P-1. Smoke Detector Protective Safeguard, Evermore should have noted its request for that accommodation on the Application and/or in the Notes section of the Warranty Compliance Certification.

28.     However, Evermore failed to do so and made no request to KSIC for such an accommodation. Evermore also failed to notify KSIC prior to the Loss that, in violation of the P-1. Smoke Detector Protective Safeguard, there were no smoke detectors physically located in the grows rooms at the Property.

### The Fire Alarm Monitoring System

29.     In 2017, Evermore entered into a "Standard Fire Alarm Monitoring and Service Agreement" (the "Monitoring Agreement") with Dantech Security, Inc. ("Dantech").

30.     Pursuant to the Monitoring Agreement Dantech was to "monitor the system for any signals that may come in and take the action as needed based on the type of signal received." *See* **Exhibit 9**, EUO of Dan Uddeme 18:3-10. Dantech subcontracted its monitoring services at the Property to a third-party monitoring station, COPS Monitoring. *Id.* at 19:14-19; 20:16.

31.    According to Dan Uddeme, Dantech's founder and owner, there are only three (3) types of signals that Dantech and/or COPS Monitoring would respond to for Evermore: (1) an Alarm signal, (2) a Supervisory signal, and (3) a Trouble Condition signal. *Id.* at. 18:13-20. These signals would be transmitted to the central station, COPS Monitoring, to process and respond to accordingly. *Id.* at. 19:18-19.

32.    As the "Alarm" signal is an actual fire alarm, that signal would be automatically dispatched and/or transmitted to the Baltimore City Fire Department and then COPS Monitoring would contact the specific Evermore employees included in the list provided to Dantech to notify them that an actual fire alarm was received. *Id.* at 18:13-14; 19:8-11; 21:16-23:4. However, an Alarm signal is only triggered by a flow of the sprinklers which could come from a manual pull station at the Property or be activated from a heat detector. *Id.* at. 23:14-21. Pursuant to Mr. Uddeme's testimony a duct detector would "[a]bsolutely, never" trigger an Alarm signal. *Id.* at 24:9-12.

33.    A "Supervisory" signal typically comes from devices like duct detectors and, upon such a signal, COPS Monitoring would contact the specific Evermore employees included in the list provided to Dantech to notify them that such an alarm was received, but this kind of signal would not be automatically dispatched and/or transmitted to the Baltimore City Fire Department. *Id.* at 18:15-16; 23:9-11. A Supervisory signal is triggered by duct detectors and by the turning of valves on a sprinkler. *Id.* at 23:22-24:8.

34.    According to Mr. Uddeme, duct detectors are designed to determine if there are dust particles or other foreign particles in the air handling system and to subsequently shut down the system if necessary. *Id.* at 24:14-16. Mr. Uddeme explained that duct detectors would never trigger a fire alarm in the system maintained by Evermore because duct detectors are simply not

designed to be fire alarms. *Id.* at 24:9-17. As discussed *supra*, duct detectors are supervisory in nature and a notification device that requires COPS Monitoring to contact the employees designated by Evermore to respond by further investigating the signal. *Id.* at 24:17-21.

35.    A "Trouble Condition" signal can come from a variety of situations and COPS Monitoring would notify the designated Evermore employees by way of text message during normal business hours. *Id.* at 23:5-9; 25:17-18. A Trouble Condition can be triggered by a number of things such as if a monitored device is taken off the wall; if there is moisture or dirt in a duct detector; and/or if a pull station has an issue with a wire, etc. *Id.* at 25:18-26:4.

36.    Pursuant to the Fire Alarm Map, Evermore utilized duct detectors as the smoke detecting devices for the monitoring of all nine (9) grow rooms at the Property. *See* Exhibit 7.

37.    The Fire Alarm Map also indicates that the duct detectors were not physically located in the grow rooms, but outside the grow rooms in the hallway or mezzanine areas. *Id.*

38.    When Mr. Uddeme was asked whether the duct detectors were physically located in the grow room spaces, he testified, unequivocally, that "[t]he physical device is not." *See* Exhibit 9, 53:16-21. And when asked "when we're talking about the duct detector, the smoke detectors, those are not located in the physical grow room spaces for [the Property]", Mr. Uddeme testified "Correct". *Id.* at 54:2-6.

### The Loss

39.    On the morning of April 7, 2024, at approximately 7:07 A.M., a fire ignited at the Property in Grow Room #8.

40.    At approximately 7:08 A.M., a "FIRE SUPERVISORY" signal emitted from fire alarm system at the Property. Very shortly following the "FIRE SUPERVISORY" signal, at

approximately 7:09 A.M., COPS Monitoring attempted to contact Jesse Mondrey, the Head Grower at Evermore. *See* **Exhibit 10**, Jesse Mondrey EUO, 33:11-34:18.

41.    Mr. Mondrey was asleep at the time COPS Monitoring attempted to contact him, and he woke up to two missed calls and voicemails from them in addition to a text message from Kendrick King, the Head of Security at Evermore. *Id.* at 35:14-36:22; 43:9-16; 45:1-7.

42.    The text message from Mr. King stated, "Should I check this out?" and included "[a] picture of what looked like a room with a dark screen that was not visible." *Id.* at 45:8-15.

43.    At approximately 7:20 A.M., Mr. Mondrey and Mr. King had a phone conversation about who should go to the Property to investigate the "FIRE SUPERVISORY" signal. *Id.* at 46:2-22. Mr. Mondrey told Mr. King that he would go to the Property to investigate the signal and Mr. Mondrey arrived at the Property between 7:40 and 7:45 A.M. *Id.* at 46:12-47:10.

44.    When Mr. Mondrey arrived at the property, he made his way to Grow Room #8, the room designated on the picture from Mr. King's text message. *Id.* at 48:4-12.

45.    As Mr. Mondrey made his way towards Grow Room #8, he smelled smoke. *Id.* at 48:20-22. When Mr. Mondrey arrived at Grow Room #8, he opened the door and observed smoke coming out of the room. *Id.* at 48:13-22.

46.    Mr. Mondrey testified that Grow Room #8 was "so smoky that I was unable to set foot into the room." *Id.* at 49:5-8.

47.    After observing the condition of Grow Room #8, Mr. Mondrey called Austin Weiskittel, the Director of Cultivation at Evermore, who instructed him to turn off the breaker box for the lights and to turn on the irrigation system. *Id.* at 49:22-52:1. Shortly after Mr. Mondrey's conversation with Mr. Weiskittel, Mr. King arrived at the Property and, at approximately 8:17 A.M., Evermore's employees finally made the decision to call the fire department. *Id.* at 52:11-14.

48.     At approximately 8:23 A.M, the fire department arrived at the Property (*well over an hour after the supervisory signal at 7:08 A.M.*). *See* **Exhibit 11**, Fire Incident Report, p. 1. The fire was brought under control by approximately 9:37 A.M. and the property was cleared by approximately 11:34 A.M. *Id.*

49.     After the fire was brought under control, the fire investigators were able to determine that the fire was caused by "a halogen light bulb rupturing causing hot glass to come into contact and ignite lightweight plastic and vegetations located within [Grow Room #8]." *Id.* at p. 3.

50.     Specifically, the investigation into the area of origin revealed that a high temperature halogen light located in the ceiling directly over the area of origin had only half of a ruptured light bulb remaining in the housing. *Id.* at p. 4.

## The Policy

51.     The Policy is for the period of April 4, 2024, through April 5, 2025. Exhibit 1, QS IL DS 00 09 09, p. 1.

42.     The Policy includes a Commercial Property Coverage Part and the applicable Supplemental Declarations indicate that the Property is on the schedule of covered buildings. Exhibit 1, CP DS 00 10 00, p. 1.  The Supplemental Declarations also provide that the Building Value Coverage Limit of Insurance is $11,500,000; the Business Personal Property Value Coverage Limit of Insurance is $2,850,000; the Cannabis Stock Coverage Limit of Insurance is $1,350,000; the Indoor Crop Value Coverage Limit of Insurance is $4,141,179; and the Business Income Coverage Limit of Insurance is $2,800,000.[2]

---

[2] The Indoor Crop Coverage is the most KSIC "will pay under [the Policy] for direct physical loss of or damage to growing cannabis plants for the sum of all covered expenses, including the resultant actual loss of Business Income and Extra Expense, caused by or resulting from a Covered Cause of Loss during the policy period is the amount shown in the declarations for Indoor Crop." Exhibit 1, QS CP 10 01 10 22, p. 3

43.     The Policy contains a Protective Safeguard Warranty Exclusion ("PSE") endorsement which includes (5) protective safeguards that must be complied with as a condition precedent to coverage. Exhibit 1, QS CP 10 16 02 24, p. 1. The PSE conditions provide, in pertinent part:

*        *        *

## ADDITIONAL PROTECTIVE SAGUARDS WARRANTY EXCLUSION

**This endorsement modified insurance provided under the following:**

**COMMERCIAL PROPERTY COVERAGE PART**

The terms "you", "your" and "insured" as used herein refer to the named insured identified in the Policy Declarations. The "Company", "we" and "us" refer to the underwriting entity identified in the Policy Declarations.

The insurance does not apply to "property damage" or loss of the insured's "stock" of cannabis of cannabis products or a "suspension" of your "operations" during the "period of restoration" at the scheduled location identified below unless, as a conditions precedent to coverage, the insured has complied with each Protective Safeguard checked below.

| SCHEDULE | | |
|---|---|---|
| **Premises Number** | **Building Number** | **Protective Safeguard Symbols Applicable** |
| All | All | P-1, P-2, P-3, P-7, P-9 |
| Describe any "P-10": N/A | | |
| * Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. | | |

**P-1. Smoke Detector Protective Safeguard**

A. In consideration of the premium at which this policy is written, it is a condition of this policy that the insured premises listed the schedule above is equipped with smoke detectors that are located throughout the building, ***including but not limited to at least one smoke detector that is physically located in each grow room.*** All smoke detectors must be hardwired, remotely monitored and provide immediate alerts when the building is unoccupied. The insured must maintain monitor servicing records and provide evidence annually to this Company that a monitoring service contract is in place at all times.

13

The insured shall exercise due diligence in maintaining in complete working order all equipment and services pertaining to the operation of this system which are under the control of the insured and shall give immediate notice of any impairment in or suspension of the smoke detectors equipment or service, known to the insured, to this Company.

**B.** The following is added to the Exclusions section of the Causes of Loss – Special Form:

**Additional Protective Safeguards Warranty – Smoke Detector Condition**
We will not pay for loss or damages caused by smoke or fire if, prior to the loss or damage, you failed to comply with each Protective Safeguard set forth in Section A. above.

*        *        *

**P-3. High Intensity Discharge Light Bulbs Protective Safeguard**

**A.** In consideration premium at which this policy is written, it is a condition of this policy that *if the premises schedule above utilizes high intensity discharge light bulbs, it is warranted that they must be replaced within 80% of the life expectancy and or limited liability period*, whichever is less based on actual utilization. *The insured must maintain a record of the purchase, installation, and replacement schedule of the light bulbs*. The insured also warrants the high intensity discharge light bulbs are used in the recommended and appropriate fixtures, Acceptable high intensity discharge light bulbs must have a 1 year warranty with the manufacturer.

The insured shall exercise due diligence in maintaining in complete working order all equipment and services pertaining to the operation of this system which are under the control of the insured and shall give immediate notice of any impairment in or suspension of the high pressure sodium light bulb or service, known to the insured, to this Company.

**B.** The following is added to the Exclusions section of the Causes of Loss – Special Form:

**Additional Protective Safeguards Warranty – High Intensity Discharge Light Bulb Clause**
We will not pay for loss or damages caused by smoke or fire condition as a result of a bulb explosion or failure if, prior to the bulb explosion or failure, you failed to comply with each Protective Safeguard set forth in Section A. above.

Exhibit 1, QS CP 10 16 02 24, p. 1-2 (emphasis added).

<u>**Insurance Dispute and Application of the Policy**</u>

44.      In Maryland, "[a]n insurance policy is a contract between the parties, the benefits and obligations of which are defined by the terms of the policy." *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 165 (1997).  As such, courts "have repeatedly held that the construction of insurance

contracts in Maryland is confined to the few well-established principals that are applied to the construction of contracts generally." *Id.*

45.    Therefore, "when deciding the issue of coverage under and insurance policy, the primary principal of construction if to apply the terms of the contract itself." *Kendall*, 348 Md. at 166 (quoting *Bausch & Lomb v. Utica Mutual*, 330 Md. 758, 779, (1993)).

46.    Further, Maryland does not follow the rule that an insurance policy is to be construed most strongly against the insurer. *See Cheney v. Bell National Life*, 315 Md. 761, 766 (1989). Instead, Maryland follows the rule applicable to construction of contracts generally, in that the intention of the parties is to be ascertained from the policy as a whole. *Id.* Thus, courts analyze the plain language of an insurance policy according words and phrases their ordinary and accepted meanings as defined by what a reasonably prudent law person would mean them to mean. *See Pacific Indem. Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388 (1985); *see also Kendall*, 348 Md. at 166.

47.    Maryland law has also long recognized that insurance policies may be voided *ab initio* where an insurer issued a policy in reliance on a material misrepresentation. *Encompass Home & Auto Ins. Co. v. Harris*, 93 F. Supp. 3d 424, 432 (D. Md. 2015). The policy is rendered voidable "regardless of whether the material misrepresentation was made intentionally, or through mistake and in good faith." *Hofmann v. John Hancock Mut. Life Ins. Co.*, 400 F. Supp 827, 830 (D. Md. 1975) (*quoting State Farm Mut. Auto Ins. Co. v. West*, 149 F. Supp. 289, 305 (D. Md. 1957)).

48.    A misrepresentation regarding a protective safeguard is necessarily material because the safeguard "defines the scope of the coverage, triggering [the insurer's] obligation only

if [the insured] maintains its protective devices in 'complete working order'." *Mt. Hawley Ins. Co. v. Adell Plastics, Inc.*, 348 F. Supp. 3d 458, 470 (D. Md. 2018).

49.    Further, when an insurance policy includes protective safeguards requiring that an insured maintain a particular means of safeguarding it's property, "[w]here the conditions are clear and plainly expressed, the court is bound to enforce the contract in accordance with its terms." *See Mt. Hawley Ins. Co.*, 348 F. Supp. 3d at 467 (*quoting* Marjorie A. Shields, *Enforceability of Ins. Policy Protective Safeguards Endorsement*, 73 A.L.R.6th 681 (2012)).

50.    Thus, protective safeguard endorsements are fully enforceable in Maryland, and as such, an insurer may properly deny coverage if the insured fails to maintain the safeguards as required. *See Mt. Hawley Ins. Co.*, 348 F. Supp. 3d at 467 (stating "[i]f an insured fails to comply with the terms of a Protective Safeguard Endorsement, the insured's claim for coverage fails, and the insurance company has no contractual obligation under the insurance policy.")

51.    The Application Mr. Zuskin signed on behalf of Evermore expressly warned Evermore that KSIC's offer of insurance was conditioned upon the accuracy of the information provided by Evermore and/or its agents. Exhibit 2b, p. 9.

52.    The Application, consistent with Maryland law, also advised Evermore that "[a]ny misrepresentations or concealments in the request to quote, the application, including attachments, or the request to bind for insurance *will render insurance coverage null and void at inception*." Exhibit 3, p. 1. (emphasis added).

53.    The Application asked Evermore "Do the grow rooms have smoke detectors in them?" and the Warranty Compliance Certification asked Evermore "Do You Comply [with the P-1. Smoke Detector Protective Safeguard Warranty Requirement]?". Exhibit 2b, p. 4; Exhibit 4, p.

1. Evermore responded in the affirmative to both questions and represented, unconditionally, that it maintained a smoke detector physically located in each grow room, including Grow Room #8.

54.     Evermore though, *did not* have at least one smoke detector physically located in the grow rooms at the Property and specifically did not have a smoke detector physically located in Grow Room #8 on the Date of Loss.

55.     The Fire Alarm Map indicated that the duct detectors were physically located *outside* of the grow rooms and Mr. Uddeme testified that the duct detectors were not physically located in the grow rooms. Exhibit 9, 53:16-21; 54:2-6.

56.     Evermore simply assumed that the duct detectors it installed outside the grow rooms at the Property in the hallway and mezzanine areas over a year and half before it submitted its Application to KSIC for the Policy would also satisfy the P-1. Smoke Detector Protective Safeguard.  Evermore conceded that it never even submitted a fire plan to the Baltimore City Fire Department that included smoke detectors physically located in the grow rooms at the Property.

57.     Therefore, it is irrefutable that Evermore misrepresented in its Application that it maintained at least one smoke detector physically located in each grow room at the Property and such misrepresentation is inherently material as it concerned a protective safeguard. Thus, the Policy, under Maryland law, is now void *ab initio*.

58.     The Application also asked Evermore, "Is a light bulb replacement log kept of how often the light bulbs are replaced?"; and "Are all cultivation light bulbs replaced before 80% of expected life?" Further, the Warranty Compliance Certification asked Evermore, "Do You Comply [with the P-3. High Intensity Discharge Protective Safeguard Warranty Requirement]?" Exhibit 2b, p. 4; Exhibit 4, p. 2.   Evermore responded in the affirmative to the aforementioned questions and represented, unconditionally, that it maintained a record of the bulb replacement and that it

replaced the high intensity discharge light bulbs per the safeguard requirements, including the bulbs in Grow Room #8.

59.    However, despite multiple requests to Evermore to demonstrate its compliance with the P-3. High Intensity Discharge Protective Safeguard, Evermore failed to produce the requested documentation. Due to Evermore's lack of compliance with this request during the course of KSIC's investigation, KSIC is compelled to conclude that Evermore also misrepresented its compliance with this protective safeguard, which, is also inherently material as it pertains to a protective safeguard. Thus, upon this independent violation, the Policy, again, under Maryland law, is now void *ab initio*.

60.    Additionally, the PSE expressly provides, "[t]his insurance ***does not apply*** to 'property damage' or loss of the insured's 'stock' of cannabis or cannabis products or a 'suspension' of your 'operations' during the 'period of restoration' at the scheduled location identified below ***unless, as a <u>condition precedent</u> to coverage***, the insured has complied ***with each*** Protective Safeguard checked below." Exhibit 1, QS CP 10 16 02 24, p. 1 (emphasis added). The PSE Endorsement indicates the P-1. Smoke Detector Protective Safeguard and P-3. High Intensity Discharge Light Bulbs Protective Safeguard apply to "All" buildings on the Policy, including the Property where Grow Room #8 is located. *Id.*

61.    The P-1. Smoke Detector Protective Safeguard required that there be "at least one smoke detector that is ***physically located in each grow room***" and further stated "[KSIC] will not pay for a loss of damages caused by smoke or fire if, prior to the loss or damage, you failed to comply with [this protective safeguard]." Exhibit 1, QS CP 10 16 02 24, p. 1 (emphasis added).

62.    The P-3. High Intensity Discharge Light Bulbs Protective Safeguard required that the high intensity discharge light bulbs "***must be replaced within 80% of the life expectancy and***

*or limited liability period*, whichever is less based on actual utilization" and that the insured "*must maintain a record of the purchase, installation, and replacement schedule of the light bulbs*." *Id.* at p. 2. The P-3. High Intensity Discharge Light Bulbs Protective Safeguard further stated, "[KSIC] will not pay for loss or damages caused by smoke or fire condition as a result of a bulb explosion or failure if, prior to the bulb explosion or failure, you failed to comply with [this protective safeguard]. *Id.*

63.    As discussed *supra*, when deciding the issue of coverage under an insurance policy one is to apply the terms of the contract itself, analyzing the plain language of the insurance policy and giving the words and phrases their ordinary and accepted meanings as a reasonably prudent person would understand them to mean. *See Kendall*, 348 Md. at 166 (*quoting Bausch & Lomb*, 330 Md. at 779; *see also Pacific Indem. Co*, 302 Md. at 388. Additionally, where the conditions of a protective safeguard are clear and plainly expressed, the protective safeguard is fully enforceable. *See Mt. Hawley Ins. Co.,* 348 F. Supp. 3d at 467 (*quoting* Marjorie A. Shields, *Enforceability of Ins. Policy Protective Safeguards Endorsement*, 73 A.L.R.6th 681 (2012)).

64.    Here, the conditions of the protective safeguard endorsement are clear and plainly expressed, the PSE provides that "[t]his insurance *does not apply* to 'property damage' or loss of the insured's 'stock' of cannabis or cannabis products or a 'suspension' of your 'operations' during the 'period of restoration' at the scheduled location identified below *unless, as a <u>condition precedent</u> to coverage*, the insured has complied *with each* Protective Safeguard checked below." Exhibit 1, QS CP 10 16 02 24, p. 1.

65.    The P-1. Smoke Detector Protective Safeguard is also clear and plainly expressed. It requires that there be "at least one smoke detector that is *physically located in each grow room*" and also provides that "[KSIC] *will not pay for a loss of damages caused by smoke or fire if, prior*

19

*to the loss or damage, you failed to comply with each [this protective safeguard]." Id* (emphasis added).

66. Here, Evermore did not comply with the P-1. Smoke Detector Protective Safeguard. The picture of the duct detector and the Fire Alarm Map show that the duct detectors were not "physical located in each grow room" but were instead physically located outside of the grow rooms. *See* Exhibit 6; Exhibit 7. Mr. Zuskin testified that Evermore did not have to comply with the P-1. Smoke Detector Protective Safeguard, which required Evermore to have a smoke detector physically located in each grow room, because it was not required by the state, city, or county, and conceded that Evermore never attempted to submit a new fire alarm plan that included at least one smoke detector physically located in each grow room. *See* Exhibit 8, 58:12-19; 65:3-6. Further, Mr. Uddeme testified, unequivocally, that the duct detectors were not physically located in the grow rooms. *See* Exhibit 8, 53:16-21; 54:2-6.

67. Therefore, the evidence that Evermore did not have at least one smoke detector *physically located* in each grow room at the Property, including Grow Room #8, and that Evermore therefore did not comply with the P-1. Smoke Detector Protective Safeguard, is overwhelming.

68. The P-3. High Intensity Discharge Light Bulbs Protective Safeguard is similarly clear and plainly expressed. It required that the high intensity discharge light bulbs "*must be replaced within 80% of the life expectancy and or limited liability period*, whichever is less based on actual utilization" and that the insured "*must maintain a record of the purchase, installation, and replacement schedule of the light bulbs.*" Exhibit 1, QS CP 10 16 02 24, p. 2 (emphasis added). The P-3. High Intensity Discharge Light Bulbs Protective Safeguard also provides, "[KSIC] *will not pay for loss or damages caused by smoke or fire condition as a result of a bulb*

*explosion or failure if, prior to the bulb explosion or failure, you failed to comply with [this protective safeguard].* Id. (emphasis added).

69.    As discussed *supra*, Evermore has failed to produce any documentation of compliance with the P-3. High Intensity Discharge Light Bulbs Protective Safeguard, despite multiple requests throughout the course of KSIC's investigation to provide the same. Thus, KSIC is compelled to conclude that Evermore also misrepresented its compliance with this protective safeguard.

70.    Further, the damages arising from the Loss resulted from fire and smoke due to "a halogen light bulb rupturing causing hot glass to come into contact and ignite lightweight plastic and vegetations located within [Grow Room #8]." Exhibit 7, p. 3.

71.    Evermore was in violation of the P-1. Smoke Detector Protective Safeguard and the P-3. High Intensity Discharge Light Bulbs Protective Safeguard on the Date of Loss and compliance with these protective safeguards is a condition precedent to coverage.  Consequently, as result of Evermore's violations, KSIC has no duty to provide coverage to Evermore for any of the damages resulting from the Loss.

72.    Moreover, because KSIC issued the Policy to Evermore in reliance on material misrepresentations by Evermore that it was in compliance with the P-1 and P-3 Protective Safeguards (which specifically warned Evermore that KSIC would not pay for losses or damages caused by smoke or fire if those safeguards were violated), the Policy, under Maryland law, is void *ab initio* and KSIC has no obligation to pay for any damages resulting from the Loss.

73.    On December 20, 2024, KSIC informed Evermore that "there is no coverage available under the Policy for the Loss because Evermore was in violation of the P-1 Smoke Detector Safeguard on the Date of Loss." *See* Coverage Determination Letter, attached hereto as

**Exhibit 12,** at 1. In that same letter, KSIC also informed Evermore that "KSIC also notes that it has not been provide with the documentation necessary to demonstrate that Evermore was in compliance with the P-3 requirement on the Date of Loss despite KSIC's request for same, which further supports KSIC's decision to void the Policy." *Id.* at 15.

74.    On February 11, 2025, Randolph H. Goodman, writing for Evermore's public adjuster, Goodman-Gable-Gould Company ("GGG"), stated, in response to KSIC's Coverage Determination Letter, that "We strongly disagree; the duct detectors connection to the ducts and/or air handlers does qualify as physically being in the room. We are confident Knight Specialty, contrary to its position on this case, has previously agreed that the duct detectors located in a vent or ductwork qualifies as physically located in the grow rooms." *See* GGG Public Adjuster Letter, attached hereto as **Exhibit 13**, at 2.

75.    Mr. Goodman failed to cite to or attach any evidence of Evermore's claim that KSIC "previously agreed" that duct detectors clearly located outside the grow rooms of the Property in the hallway or mezzanine areas qualify as being physically located in the grow rooms. Mr. Goodman also failed to cite to or attach any evidence of Evermore's compliance with the P-3 requirement, despite KSIC's multiple requests for same.

76.    On March 28, 2025, KSIC's third-party administrator, Network Adjusters, Inc., responded to the GGG Public Adjuster Letter and advised GGG and Evermore that:

> Following the issuance of the Coverage Determination Letter, KSIC allowed you and your client a reasonable period of time to gather any contrary evidence and/or to prepare any contrary arguments that may bear on KSIC's denial. On February 11, 2025, KSIC finally received a letter from you in response. After reviewing your response and the information you have provided, we note that the response fails to address any of the specific points raised above and/or any of the reasons for the denial stated in the Coverage Determination Letter. Instead, you, in wholly conclusory fashion merely state that you "strongly disagree" with KSIC's conclusion that the duct detectors were not physically located in the grow room.

That assertion is unsubstantiated and not only lacks evidentiary support but runs counter to the evidence available.

*See* KSIC Response Letter, attached hereto as **Exhibit 14**, at 3.

77.     The KSIC Response Letter also notified GGG and Evermore that "In accordance with KSIC's declaration that the Policy is void ab initio, enclosed please find a refund check in the amount of $206,594.93 representing the premium paid by Evermore.  KSIC reserves all rights under the Policy."  *Id*. at 4.

78.     On April 28, 2025, GGG informed KSIC that "Evermore will not accept the check at this time" and that Evermore still disagreed with KSIC's coverage denial. *See* GGG Premium Payment Rejection Letter, attached hereto as **Exhibit 15**, at 1.  Once again, GGG and Evermore failed to cite to and/or attach any contrary evidence or authority for Evermore's disagreement.

## COUNT I – DECLARATORY JUDGMENT - MISREPRESENTATION

79.     KSIC incorporates Paragraphs 1-78 as if fully set forth herein.

80.     An insurance company may render a policy void *ab initio* where the insurer issued a policy in reliance on a material misrepresentation the insurer.

81.     Evermore made numerous material misrepresentations in their Application to KSIC for insurance and specifically made material misrepresentations pertaining to certain protective safeguards required under the Policy.

82.     Therefore, KSIC was entitled to treat the Policy as void *ab initio* and as such has no contractual obligations under the Policy to Evermore for the Loss; and specifically has no contractual obligation to indemnify Evermore for any damages arising from the Loss.

WHEREFORE, Plaintiff, KSIC Insurance Company respectfully requests this Court:

A.     Determine and adjudicate the rights and obligations of the parties with respect to the Policy, the Loss, and each other;

23

B.      Declare that the KSIC correctly rendered the Policy void *ab initio* and that KSIC has no contractual obligations under the Policy for the Loss; and

C.      Grant such other and further relief as the nature of this cause of action may require.

## COUNT II – DECLARATORY JUDGMENT – NON-COMPLIANCE WITH P-1 PROTECTIVE SAFEGUARDS

83.     KSIC incorporates Paragraphs 1-82 as if fully set forth herein.

84.     The PSE stated that compliance with the P-1. Smoke Detector Protective Safeguard was a condition precedent to coverage under the Policy.

85.     The P-1. Smoke Detector Protective Safeguard specifically required Evermore to have at least one smoke detector physically located in each grow room and informed Evermore that KSIC would not pay for losses or damages caused by smoke or fire if, prior to the loss or damage, they were not in compliance with such protective safeguard.

86.     Evermore was not in compliance with the P-1. Smoke Detector Protective Safeguard as Evermore did not have at least one smoke detector physically located in each grow room, including Grow Room #8 where the Loss occurred.

87.     Further, the damages arising from the Loss resulted from fire and smoke.

88.     As Evermore was not in compliance with the P-1. Smoke Detector Protective Safeguard, KSIC has no duty to provide coverage for the damages Evermore sustained as a result of the Loss.

WHEREFORE, Plaintiff, KSIC Insurance Company respectfully requests this Court:

A.      Determine and adjudicate the rights and obligations of the parties with respect to the Policy, the Loss, and each other;

B.      Declare that the Policy does not provide coverage for the damages arising from the Loss;

C.      Grant such other and further relief as the nature of this cause of action may require.

### COUNT III – DECLARATORY JUDGMENT – NON-COMPLIANCE WITH P-3 PROTECTIVE SAFEGUARDS

89.      KSIC incorporates Paragraphs 1-88 as if fully set forth herein.

90.      The PSE stated that compliance with the P-3. High Intensity Discharge Light Bulbs Protective Safeguard was a condition precedent to coverage under the Policy.

91.      The P-3. High Intensity Discharge Light Bulbs Protective Safeguard specifically required Evermore to replace such bulbs within 80% of the life expectancy and or limited liability period and to maintain a record of the purchase, installation, and replacement schedule of the light bulbs. The P-3. High Intensity Discharge Light Bulbs Protective Safeguard also informed Evermore that KSIC would not pay for losses or damages caused by smoke or fire condition as a result of a bulb explosion or failure if, prior to the loss or damage, they were not in compliance with such protective safeguard.

92.      KSIC is compelled to conclude that Evermore was not in compliance with the P-3. High Intensity Discharge Light Bulbs Protective Safeguard due to Evermore's failure to produce the requested documentation to demonstrate Evermore's compliance with this protective safeguard to KSIC.

93.      Further, the damages arising from the Loss resulted from fire and smoke condition due to a high intensity discharge light bulb explosion.

94.    As Evermore was not in compliance with the P-3. High Intensity Discharge Light Bulbs Protective Safeguard, KSIC has no duty to provide coverage for the damages Evermore sustained as a result of the Loss.

WHEREFORE, Plaintiff, KSIC Insurance Company respectfully requests this Court:

D.    Determine and adjudicate the rights and obligations of the parties with respect to the Policy, the Loss, and each other;

E.    Declare that the Policy does not provide coverage for the damages arising from the Loss;

F.    Grant such other and further relief as the nature of this cause of action may require.

Respectfully submitted,

/s/ Kambon R. Williams
Kambon R. Williams (Federal Bar No. 29872)
Pessin Katz Law, P.A.
4690 Millennium Drive, Suite 200
Belcamp, Maryland 21017
(410) 938-8800
kwilliams@pklaw.com
***Attorneys for Plaintiff***